IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

IN RE:        HEALTH DIAGNOSTIC LABORATORY,        Case No. 15-32919
              INC., *et al.*,                      Chapter 11
                                                   (Jointly Administered)
                     Debtors.

_____

RICHARD ARROWSMITH, as Liquidating
Trustee of the HDL Liquidating Trust,

              Plaintiff,

v.
                                                   AP No. 17-04300

UNITED STATES OF AMERICA, *et al.*,

              Defendants.

_____


## MEMORANDUM OPINION

The Court must decide in this adversary proceeding whether subchapter S corporation status ("S corporation status") under Title 26 of the United States Code (the "Tax Code")[1] is considered "property" for the purposes of 11 U.S.C. §§ 544(b), 548. A hearing on that issue was held on November 30, 2017 (the "Hearing"), at which time the Court took the matter under advisement. For the reasons set forth below, the Court holds that S corporation status is not "property" for the purposes of 11 U.S.C. §§ 544(b), 548.

---

[1] *See* 26 U.S.C. §§ 1–1400u-3. All further references to the Tax Code are to the Internal Revenue Code (the "I.R.C.") as codified at 26 U.S.C. §§ 1 *et seq.*

**Jurisdiction and Venue**

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue is appropriate in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background and Procedural History**

Health Diagnostic Laboratory, Inc. ("HDL") was a privately held company based in Richmond, Virginia, that offered clinical laboratory services to physicians around the country. Under HDL's business model, HDL processed blood tests it received from physicians and tested biomarkers for the indication of risk for cardiovascular disease, diabetes, and other illnesses. Afterwards, HDL would reimburse the referring physicians for the costs associated with collecting, processing, and handling the blood samples that they had sent to HDL for testing.  In January of 2013, the United States Department of Justice ("DOJ") and United States Department of Health and Human Services' Office of Inspector General ("HHS OIG") commenced an investigation into HDL in connection with HDL's business practices including its payment of process and handling fees to the referring physicians as potential violations of the federal anti-kickback statute.  HHS OIG issued a special fraud alert on June 25, 2014, advising that the payment of processing and handling fees to referring physicians could violate certain federal anti-kickback laws.

After the special fraud alert, negative publicity and lawsuits ensued.  In April 2015, HDL agreed to a multi-million dollar settlement for alleged violations of the federal False Claims Act along with a corresponding corporate integrity agreement with HHS OIG.  By that time, HDL's relationship with its prepetition secured lender, Branch Banking and Trust Company ("BB&T"),

had become severely strained.  HDL eventually defaulted under its BB&T loan facilities.  In response, BB&T discontinued HDL's borrowing ability and cut off HDL's access to its existing accounts.  With no ability to access its cash and with no alternative sources of financing immediately available, HDL was forced to file for protection under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").[2]

On June 7, 2015 (the "Petition Date"), HDL, Central Medical Laboratory, LLC, and Integrated Health Leaders, LLC (the "Debtors") commenced bankruptcy cases (the "Bankruptcy Cases") by each filing a separate voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia (the "Court").[3] On June 16, 2015, the United States Trustee for the Eastern District of Virginia appointed a statutory committee of unsecured creditors in accordance with section 1102 of the Bankruptcy Code (the "Committee").

*HDL's Corporate and Tax Structure*

As of the Petition Date, HDL had a four-member Board of Directors (the "Board"), which included Noel L. Bartlett, Robert S. Galen, Joseph P. McConnell, and George Russell Warnick.  HDL had 19 shareholders who each owned various percentages of stock.[4]  Due to its

---

[2] *See* 11 U.S.C. §§ 1101–1174.  All further references to the Bankruptcy Code are to the Bankruptcy Code as codified at 11 U.S.C. §§ 101 *et seq.*

[3] On June 9, 2015, this Court entered an Order Granting Joint Administration.  *See* Order Granting Motion for Joint Administration, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va. June 9, 2015), ECF No. 42.

[4] Tipton Golias owned 38.4795%; Joseph P. McConnell owned 12.8336%; LaTonya S. Mallory owned 8.9048%; George Russell Warnick owned 7.6236%; The Warnick Family 2012 Irrevocable Trust owned 7.2834%; Scott Mallory owned 6.0021%; Joseph Golias owned 5.21%; Donald Golias owned 2.605%; Karla Falgout owned 2.605%; The Joseph P. McConnell 2012 Irrevocable Trust owned 2.0734%; Floyd Calhoun Dent III owned 1.563%; Robert Bradford Johnson owned 1.563%; The Wyndell L. Golias Voting Trust owned 1.1164%; Robert S. Galen owned 1.042%; Noel D. Bartlett owned 0.2605%; Eric Petersen owned 0.2605%; David Mayes owned 0.2605%; John Tessler owned 0.2605%; and Pamela Oates owned 0.0532% (collectively the "Shareholder Defendants"). Satyanarain Rangarajan initially owned 5.1%, but HDL repurchased his stock in 2013.

corporate and shareholder attributes, HDL had the capacity to qualify as a "small business corporation" as defined by 26 U.S.C. § 1361(b).

On or about February 16, 2009, HDL filed an election to be classified as an S corporation under 26 U.S.C. § 1362, pursuant to unanimous shareholder consent as required by 26 U.S.C. § 1362(a)(2). Correspondingly, HDL filed S corporation elections with the State of New York Department of Taxation and Finance, the State of Arkansas Department of Finance and Administration, and the State of Mississippi Department of Revenue. Every other state where HDL did business either accepted the federal S corporation status election or did not recognize S corporation status.[5]

In accordance with Section 12(b) of the HDL Shareholders' Agreement, HDL made distributions to its shareholders as means to reimburse them for HDL's pass-through tax liability.[6] HDL also made direct payments to the Internal Revenue Service (the "IRS") and the State Taxing Authorities on behalf of the shareholders. Every year, HDL filed IRS form 1120S, which included a schedule K-1 for each shareholder ("Schedule K-1") as it was required to do by section 6037(c)(1) of the Tax Code. HDL submitted corresponding forms to the State Taxing

---

[5] Those tax authorities include the State of Alabama Department of Revenue, State of California Franchise Tax Board, State of Colorado Department of Revenue, State of Georgia Department of Revenue, State of Illinois Department of Revenue, State of Kansas Department of Revenue, Comptroller of the State of Maryland, State of Michigan Department of Treasury, State of Missouri Department of Revenue, State of North Carolina Department of Revenue, State of Ohio Department of Revenue, Commonwealth of Pennsylvania Department of Revenue, State of South Carolina Department of Revenue, State of Utah State Tax Commission, Commonwealth of Virginia Department of Taxation, and State of Wisconsin Department of Revenue (together with New York Department of Taxation and Finance, the State of Arkansas Department of Finance and Administration, and the State of Mississippi Department of Revenue, the "State Taxing Authorities").

[6] HDL and the Shareholder Defendants entered into a shareholders' agreement dated June 23, 2009, which provided the bases for the treatment of the pass-through income and the payments of taxes accruing thereon (the "Shareholders' Agreement"). *See* Exhibits at Ex. C, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919, APN 17-04300 (Bankr. E.D. Va. Nov. 27, 2017), ECF No. 51.

HDL distributed the following payments to shareholders to reimburse them for HDL's pass-through tax liability: 2011 ($1,794,583); 2012 ($31,814,571); 2013 ($27,745,102); 2014 ($6,378,963).

Authorities.  Personally, the shareholders included on their individual tax returns the income, deductions, credits and other items displayed on the Schedules K-1.[7]

On January 1, 2015, HDL filed a Notice of Termination of HDL's S corporation status with the IRS and the State Taxing Authorities.  As required by federal law, a majority of HDL's shareholders had voted in favor of revoking HDL's S corporation status.  Consequently, as of the Petition Date, HDL was subject to C corporation tax.

*Bankruptcy Proceedings*

On September 17, 2015, the Court entered an order (the "Sale Order"), which authorized the sale of substantially all of the Debtors' assets to True Health Diagnostics, LLC ("True Health") under the terms of an Asset Purchase Agreement ("APA").[8]  On September 29, 2015, True Health acquired substantially all of the Debtors' operating assets.  On May 12, 2016, the Court entered an order (the "Confirmation Order"),[9] which confirmed the Debtors' Modified Second Amended Plan of Liquidation (the "Plan").[10]  The HDL Liquidating Trust was formed pursuant the terms of the Plan on the Effective Date.[11]  Through the Plan, 11 U.S.C. § 1123, and

---

[7] HDL reported the following amounts of income/loss per return on IRS Form 1120S, Schedule K: 2011 ($19,356,406); 2012 ($126,852,431); 2013 ($20,533,302); 2014 ($19,541,772).

[8] *See* Sale Order, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va. Sept. 17, 2015), ECF No. 512.

[9] *See* Confirmation Order, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va. May 12, 2016), ECF No. 1095.

[10] *See* Plan, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va. March 25, 2016), ECF No. 995.

[11] The Plan became effective on May 12, 2016 (the "Effective Date").  *See* Notice of Confirmation of Chapter 11 Plan at 1, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va. May 14, 2016), ECF No. 1106.

the trust agreement executed to implement the Plan, the HDL Liquidating Trust is the successor

of the Debtors and the Committee.[12]

On June 7, 2017, the Liquidating Trustee commenced this adversary proceeding (the

"Adversary Proceeding") by filing a complaint (the "Tax Complaint") against the United States

Internal Revenue Service, State Taxing Authorities, and the Shareholder Defendants (the

"Defendants").   *See* Complaint, *Arrowsmith v. United States*, No. 15-32919, APN 17-04300

(Bankr. E.D. Va. June 7, 2017), ECF No. 1.  Counts 1 through 4 of the Tax Complaint seek to

avoid the revocation of the Debtors' S corporation status as a fraudulent transfer under sections

544(b) or 548 of the Bankruptcy Code.  *See id.* at 20–24.  The United States filed a motion to

dismiss (the "Motion to Dismiss") the Tax Complaint under Rule 7012(b)(6) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") on July 12, 2017.  *See* United States'

Motion to Dismiss and Brief in Support, *Arrowsmith v. United States*, No. 15-32919, APN 17-

04300 (Bankr. E.D. Va. July 12, 2017), ECF No. 4.  The United States argued in Section IV(B)

of its Motion to Dismiss that the claims asserted against it in "[c]ounts 1 through 4 regarding the

'un-revocation' of S corporation status" should be dismissed "because a debtor's tax status is not

'property.'"  *Id.* at 4, 29–31.

The Court scheduled the Hearing to determine the sole issue raised in Section IV(B) of

the Motion to Dismiss of whether S Corporation status was considered "property" for the

purposes of the fraudulent transfer provisions of 11 U.S.C. §§ 544(b), 548 (the "Hearing Issue").

*See id.* at 29–31 § IV(B).  The Court ordered the other Defendants named in the Tax Complaint

---

[12] Section 6.5(c)(12) of the Plan grants the Liquidating Trustee the power and charges the Liquidating Trustee with
the duty of pursuing claims of the Debtors, the estates, and the Creditors' Committee defined in section 1.76 of the
Plan.  *See* Confirmation Order at 81–82, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919 (Bankr. E.D. Va.
May 12, 2016), ECF No. 1095.

to "(a) file a motion, brief, or joinder regarding the Hearing Issue or (b) confirm in writing to counsel for the Plaintiff that such defendant waives the right to file any pleading regarding the Hearing Issue and agrees to be bound by the Court's disposition of the Hearing Issue" on or before September 25, 2017. *See* Order, *Arrowsmith v. United States*, No. 15-32919, APN 17-04300 (Bankr. E.D. Va. Sept. 1, 2017), ECF No. 23. All but two of the Defendants named in the Tax Complaint chose to join the United States' Motion to Dismiss.[13]

*Federal Tax Law Framework*

Under the Tax Code, the "default" tax status for corporate entities in the United States is a subchapter C corporation status ("C corporation status"). *See* 26 U.S.C. § 1361. The tax laws of subchapter C of Chapter 1, Title 26 of the Tax Code govern C corporation taxation. C corporations are subject to two levels of taxation, or "double taxation," whereby the corporation's net income is taxed, and dividends to the shareholders are taxed as well.

In contrast to C corporation status, S corporation status confers "pass-through taxation." S corporations pass corporate income, losses, deductions, and credits to their shareholders. In turn, shareholders of an S corporation must report their respective attributable shares of the

---

[13] The following parties timely joined the motion: Karl F. Warnick, Kristan Warnick, and George Russell Warnick in their capacity as Trustees of the Warnick Family 2012 Irrevocable Trust, George Russell Warnick (individually), LaTonya S. Mallory, Scott Mallory, Tipton Golias (individually), Joseph Golias, Donald Golias, Karla Falgout, Tipton Golias in his Capacity as Trustee of the Wyndell L. Golias Voting Trust, Robert S. Galen, Noel D. Bartlett, Jr., Eric Petersen, David Mayes, John Tessler, Pamela Oates, Floyd Calhoun Dent, III, Robert Bradford Johnson, State of Alabama Department of Revenue, State of Arkansas Department of Finance and Administration, State of California Franchise Tax Board, State of Colorado Department of Revenue, State of Georgia Department of Revenue, State of Illinois Department of  Revenue, Comptroller of the State of Maryland, State of Michigan Department of Treasury, State of Mississippi Department of Revenue, State of Missouri Department of Revenue, State of New York Department of Taxation and Finance, State of North Carolina Department of Revenue, State of Ohio Department of Revenue, Commonwealth of Pennsylvania Department of Revenue, State of South Carolina Department of Revenue, State of Utah State Tax Commission, Commonwealth of Virginia Department of Taxation, and State of Wisconsin Department of Revenue.

The only two Defendants who did not join in the motion were the State of Kansas Department of Revenue and Satyanarain Rangarajan. Both of those parties settled with the Liquidating Trustee before the Hearing.

income and losses of the S corporation on their personal tax returns.  *See, e.g.*, *Gitlitz v. Comm'r of Internal Revenue*, 531 U.S. 206, 209 (2001).  In order to qualify for S corporation status, a corporation must be a small business corporation.  That means it must be an eligible domestic corporation with no more than 100 shareholders (who cannot be partnerships, corporations, or non-resident alien shareholders) and have only one class of stock.  *See* 26 U.S.C. § 1361(b).[14]  In order to file for S corporation status, every shareholder of the corporation must consent to the election.  *See id.* § 1362(a)(2).  Termination of S corporation status may occur by one of three means: (1) by the consent of a majority of shareholders and the corporate entity; (2) by the corporation ceasing to be a small business corporation; or (3) by having passive corporate investment income that exceeds 25% of gross receipts for 3 consecutive taxable years along with accumulated corporate earnings and profits.  *See id.* § 1362(d)(1)–(3).

### Prior Case Law

The issue whether S corporation status constitutes property of the estate in bankruptcy is a matter of first impression within the Fourth Circuit.  Only a handful of courts outside the Fourth Circuit have considered this issue in the context of fraudulent transfers.  *See Majestic Star Casino, LLC v. Barden Dev., Inc.* (*In re Majestic Star Casino, LLC*), 716 F.3d 736 (3d Cir. 2013); *Halverson v. Funaro* (*In re Frank Funaro, Inc.*), 263 B.R. 892 (B.A.P. 8th Cir. 2001); *Parker v. Saunders* (*In re Bakersfield Westar*), 226 B.R. 227 (B.A.P. 9th Cir. 1998); *Hanrahan v. Walterman* (*In re Walterman Implement, Inc.*), No. 05-07284, 2006 WL 1562401 (Bankr. N.D. Iowa May 22, 2006); *Guinn v. Lines* (*In re Trans-Line West, Inc.*), 203 B.R. 653 (Bankr. E.D. Tenn. 1996).  Of these courts, only the Court of Appeals for the Third Circuit has concluded that S corporation status does not constitute a property right in bankruptcy.  *See In re Majestic Star*

---

[14] Some domestic corporations are ineligible to classify as an S corporation, including insurance companies, domestic international sales corporations, and certain financial institutions.  *See* 26 U.S.C. § 1361(b)(2).

*Casino*, 716 F.3d at 758; *see also Official Comm. Unsecured Creditors v. Forman* (*In re Forman Enterprises, Inc.*), 281 B.R. 600, 612 (Bankr. W.D. Pa. 2002) ("[W]e are reluctant to believe that a post-bankruptcy revocation of S status could, under the tax laws of the United States, be utilized to undo previously executed acts.  Humpty Dumpty could not be restructured using this scenario.").  All of the other courts that have addressed the issue have found S corporation status to be a property right in bankruptcy.  *See In re Frank Funaro, Inc.*, 263 B.R. at 898; *In re Bakersfield Westar*, 226 B.R. at 234; *In re Walterman Implement, Inc.*, 2006 WL 1562401 at *3; *In re Trans-Line West, Inc.*, 203 B.R. at 662.

The United States Bankruptcy Court for the Eastern District of Tennessee was the first court to consider the issue in *In re Trans-Line West, Inc.*, 203 B.R. 653 (Bankr. E.D. Tenn. 1996).  Donald Lines served as the sole shareholder of the debtor, Trans-Line West, Inc. ("Trans-Line West").  *See id.* at 656.  In 1989, Trans-Line West had elected, through unanimous vote of its one shareholder, to be treated as an S corporation.  *See id.*  That election was revoked on March 15, 1995, when Trans-Line West submitted a statement to revoke its S corporation status as well as a Statement of Consent to the revocation from the shareholder.  *See id.*  On April 12, 1995, Trans-Line West filed a petition for relief under chapter 11 of the Bankruptcy Code.  *See id.*  On April 17, 1995, the IRS accepted Trans-Line West's S corporation status revocation even though the Statement of Consent had not been signed by the owner.  *See id.*  A chapter 11 trustee was appointed in 1996.  *See id.*  There, as in the case at bar, the trustee commenced an adversary proceeding seeking to avoid the revocation of the debtor's S corporation status under 11 U.S.C. §§ 544(b), 548(a).  *See id.*  In order to decide whether the trustee could avoid the transaction as a fraudulent conveyance, the court had to determine first whether the debtor had a property interest

in its S corporation status.[15]   The court turned to the definition of "property" found in the American Jurisprudence treatise and Black's Law Dictionary as something that a person has rights over in order to use, enjoy, and dispose of.   *See id.* at 661 (citing 63A AM. JUR. 2D *Property* § 1 (1984); BLACK'S LAW DICTIONARY 1216 (6th ed. 1990)).   The bankruptcy court reasoned that the debtor did have a property interest in its S corporation status on the date that the status was allegedly transferred because the Tax Code "guarantees and protects an S corporation's right to dispose of [the S corporation] status at will."   *Id.* at 662 (citing 26 U.S.C. § 1362(d)(1)(A)).

The Bankruptcy Appellate Panel for the Court of Appeals for the Ninth Circuit relied heavily on the reasoning in *In re Trans-Line West* for its decision in *In re Bakersfield Westar*.   *See* 226 B.R. 227 (B.A.P. 9th Cir. 1998).   Bakersfield Westar was a closely held S corporation that was co-owned by two married shareholders.   *See id.* at 229.   Thirteen days before Bakersfield Westar filed a petition for relief under chapter 7 of the Bankruptcy Code, the husband submitted a Statement of Revocation of the debtor's S corporation status to the IRS with a statement that he and his wife consented to the revocation.   *See id.*   The bankruptcy trustee sought to avoid the revocation of S corporation status as a fraudulent transfer under 11 U.S.C. §§ 544(b), 548(a)(1).   *See id.*   The Bankruptcy Appellate Panel for the Ninth Circuit reasoned that Bakersfield Westar had the "guaranteed right to use, enjoy, and dispose" of the right to revoke its S corporation status.   *See id.* at 234.   Consequently, that court held that the right to make or revoke S corporation status constituted "property" or "an interest of the debtor in property."   *Id.* at 234 (citing *In re Trans-Line West, Inc.*, 203 B.R. at 661).

---

[15] The court recognized that "[a]n essential element of an action to avoid a particular transaction as fraudulent is that there have in fact been a 'transfer' of an interest of the debtor in property. . . ." *In re Trans-Lines West, Inc.*, 203 B.R. at 661.

The Bankruptcy Appellate Panel for the Court of Appeals for the Eighth Circuit touched upon the issue in *In re Frank Funaro, Inc.*, 263 B.R. 892 (B.A.P. 8th Cir. 2001). That case did not involve a trustee seeking to avoid S corporation status. Instead, the court used the decision in *In re Bakersfield Westar* to illustrate the legal principle that "actions taken by the owner [of an S corporation] for his own benefit, at the expense of the corporation and its creditors, are subject to review in the corporation's bankruptcy." *Id.* at 898 (citing *In re Bakersfield Westar*, 226 B.R. at 232–33).

The Bankruptcy Court for the Northern District of Iowa addressed the issue in a cursory manner in *In re Walterman Implement, Inc.*, No. 05-07284, 2006 WL 1562401 (Bankr. N.D. Iowa May 22, 2006). That case involved an involuntary bankruptcy petition against Walterman Implement. *See id.* at *1. Walterman Implement submitted a document to the IRS postpetition in order to revoke its S corporation status. *See id.* The President and sole shareholder of Walterman Implement signed an accompanying statement of consent on the same day. *See id.* The bankruptcy court relied on *In re Bakersfield Westar* in determining that S corporation status constituted property of the estate. *See id.* *2–3. The Court held that the sole shareholder violated the automatic stay by asserting control over property of the estate when he revoked the S corporation status postpetition. *See id.* at *3.

The Court of Appeals for the Third Circuit departed from the reasoning of *In re Trans-Line West* in its decision in *In re Majestic Star Casino*, concluding that S corporation status did not constitute an interest of the debtor in "property" in a bankruptcy case. *See* 716 F.3d 736 (3d Cir. 2013). Don H. Barden was the sole shareholder, CEO, and president of Barden Development, Incorporated ("BDI"). *See id.* at 742. In 2005, BDI acquired the corporation MSC II, which owned and operated the Majestic Star II Casino ("MSC II"). At all times relevant

11

to the case, BDI owned all of the stock of MSC II.  *See id.*  Because MSC II was "wholly owned

by an S-Corp," BDI could treat MSC II as an S corporation under 26 U.S.C. § 1361(b)(3)(B).  *Id.*

at 743.  On November 23, 2009, MSC II and related entities filed petitions for relief under

chapter 11 of the Bankruptcy Code.  *See id.*  On the day the bankruptcy petition was filed, BDI

and MSC II were both S corporations.  *See id.*  BDI and Barden did not file bankruptcy petitions

or participate as debtors in the bankruptcy cases that were filed.  *See id.*  Barden filed notice with

the IRS that he wished to revoke the S corporation status of BDI and that status was revoked as

of January 1, 2010.  *See id.* at 744.  The revocation of BDI's S corporation status resulted in the

automatic termination of MSC II's S corporation status.  *See id.* at 743–44.  In response to the

automatic termination, other debtors who had filed bankruptcy petitions with MSC II filed an

adversary complaint "asserting that the Revocation caused an unlawful postpetition transfer of

MSC II's estate property, in violation of §§ 362 and 549 of the Bankruptcy Code."  *Id.* at 745.  In

holding that the tax status was not property, the Third Circuit found the definition of "property"

was not meant to be as broad as the bankruptcy court in *In re Trans-Line West* purported it to be.

*See id.* at 758.

### Analysis

The Defendants in this action seek dismissal of Counts 1 through 4 of the Tax Complaint

pursuant to Federal Rule of Bankruptcy Procedure 7012(b), which incorporates Federal Rule of

Civil Procedure 12(b).  A complaint must contain a "short and plain statement of the claim[s]

showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Under Federal Rule of

Civil Procedure 12(b)(6), a court determines "whether the complaint, under the facts alleged and

under any facts that could be proved in support of the complaint, is legally sufficient."  *E. Shore*

*Mkts, Inc. v. J.D. Assocs. Ltd P'Ship*, 213 F.3d 175, 180 (4th Cir. 2000) (citing *Schatz v.*

*Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991)).  "[C]ourts 'are not bound to accept as true a legal

conclusion couched as a factual allegation.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "[T]he tenet that a court must

accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Counts 1 through 4 allege fraudulent transfers under sections 544(b) and 548(a)(1) of the

Bankruptcy Code and to seek to avoid the election made in 2015 to terminate the Debtors' S

corporation status.  The salient legal issue alleged is whether the Debtors' S corporation status

was an interest in "property" that was subject to transfer.  If it is not, then the election is not

subject to the fraudulent transfer provisions of sections 544(b) and 548(a)(1) of the Bankruptcy

Code.  The issue whether S corporation status is "property" for the purposes of sections 544(b)

and 548(a)(1) is a question of law.[16]  The fraudulent transfer provision in section 544(b) allows a

trustee to avoid obligations voidable under state law.[17]  The fraudulent transfer provision of

section 548(a)(1) allows a trustee to avoid certain transfers that occurred two years prior to the

petition date.[18]  Both provisions allow a trustee to avoid a fraudulent transfer of "an interest of

---

[16] "[A] trustee's power to avoid fraudulent transfers under section 548 presents a question of law."  *Stevenson v. J.C. Bradford & Co.* (*In re Cannon*), 277 F.3d 838, 849 (6th Cir. 2002); *see also United States v. Kapila*, 402 B.R. 56, 60 (S.D. Fla. 2008).

[17] Section 544(b)(1) provides that "[e]xcept as provided in paragraph (2), the trustee may avoid any transfer of *an interest of the debtor in property* or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."  11 U.S.C. § 544(b)(1) (emphasis added).

[18] Section 548(a) provides

(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of *an interest of the debtor in property*, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

the debtor in property." 11 U.S.C. §§ 544(b), 548(a)(1). For the following reasons, the Court

holds that the Debtors' S corporation status is not "property." Accordingly, there was no transfer

of an interest of the Debtors in property that is subject to avoidance under sections 544(b) or

548(a)(1) of the Bankruptcy Code. Counts 1 through 4 of the Tax Complaint will be dismissed.

Property of the bankruptcy estate is composed of "all legal or equitable interests of the

debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Congressional

intent indicates that "property" under the Bankruptcy Code is a sweeping term and includes both

intangible and tangible property. *See In re Kane*, 628 F.3d 631, 637 (3d Cir. 2010). Congress

intended that the term "property" under the Bankruptcy Code include:

> all kinds of property, including tangible or intangible property, causes of action
> (see Bankruptcy Act § 70a(6)), and all other forms of property currently specified
> in section 70a of the Bankruptcy Act § 70a, as well as property recovered by the
> trustee under section 542 of proposed title 11, if the property recovered was
> merely out of the possession of the debtor, yet remained "property of the debtor."
> The debtor's interest in property also includes "title" to property, which is an
> interest, just as are a possessory interest, or leasehold interest, for example. The

---

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)

    (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

    (ii)

        (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

        (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

        (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

        (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a) (emphasis added).

result of *Segal v. Rochelle*, 382 U.S. 375 (1966), is followed, and the right to a refund is property of the estate.

H.R. Rep. No. 95-595, at 367 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6323. "[I]n determining the scope of § 541 [the Court] must consider the purposes animating the Bankruptcy Code," which includes the intention to "'bring anything of value that the debtors have into the estate.'" *Official Comm. Unsecured Creditors v. PSS Steamship Co.* (*In re Prudential Lines Inc.*), 928 F.2d 565, 573 (2d Cir. 1991) (quoting H.R. Rep. No. 95-595, at 176 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6136)). "The scope of [§ 541] is very broad and includes property of all descriptions, tangible and intangible. . . ." *Ramsay v. Dowden* (*In re Ctr. Ark. Broad. Co.*), 68 F.3d 213, 214 (8th Cir. 1995); *see also Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 342 (4th Cir. 2013) ("The bankruptcy estate is comprised of a broad range of both tangible and intangible property interests"); *Cordova v. Mayer* (*In re Cordova*), 73 F.3d 38, 42 (4th Cir. 1996) (describing the estate created by § 541 as "broad and all-embracing" (citations omitted)).

No Bankruptcy Code provision "answers the threshold questions of whether a debtor has an interest in a particular item of property and, if so, what the nature of that interest is." *Universal Coops., Inc. v. FCX, Inc.* (*In re FCX, Inc.*), 853 F.2d 1149, 1153 (4th Cir. 1988) (citing *In re Farmers Markets, Inc.*, 792 F.2d 1400, 1402 (9th Cir. 1986); 4 *Collier on Bankruptcy* ¶ 541.02, at 541-11 (15th ed. 1985)).

> Property interests are created and defined by state law.  Unless some federal interest requires a different result . . . .  Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of a bankruptcy."

*Butner v. United States*, 440 U.S. 48, 55 (1979) (quoting *Lewis v. Mfrs. Nat'l Bank of Detroit*, 364 U.S. 603, 609 (1961)). "[W]hile federal law creates the bankruptcy estate, *Butner* and the cases following it establish that state law, absent a countervailing federal interest, determines

whether a given property falls within this federal framework." *Am. Bankers Ins. Co. of Florida v. Maness*, 101 F.3d 358, 363 (4th Cir. 1996).

Normally, the "federal [tax] statute 'creates no property rights but merely attaches consequences, federally defined, to rights created under state law.'" *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 722 (1985) (quoting *United States v. Bess*, 357 U.S. 51, 55 (1958)). However, once "'it has been determined that state law creates sufficient interests in the [taxpayer] to satisfy the requirements of [the statute], state law is inoperative,' and the tax consequences thenceforth are dictated by federal law." *Id.* (quoting *Bess*, 357 U.S. at 56–57). At that point federal law and interpretive case law, not state law, "control the ultimate issue whether a taxpayer has a beneficial interest in any property subject to levy for unpaid federal taxes." *Drye v. United States*, 528 U.S. 49, 57 (1999).

> A common idiom describes property as a "bundle of sticks"—a collection of individual rights which, in certain combinations, constitute property. State law determines only which sticks are in a person's bundle. Whether those sticks qualify as "property" for purposes of the federal tax lien statute is a question of federal law.

*Virginia Historic Tax Credit Fund 2001 LP v. Comm'r of Internal Revenue*, 639 F.3d 129, 140 (4th Cir. 2011) (citing *United States v. Craft*, 535 U.S. 274, 278–79 (2002)).

In this case, federal tax law governs any purported property right at issue. Under the *Butner* principle, there is clearly a countervailing federal interest because S corporation status is a creature of federal law under subchapter S of the Tax Code. State law created "sufficient interests" in the taxpaying entity by affording it the requisite corporate and shareholder attributes to qualify for S corporation status under 26 U.S.C. § 1361(b); thus, at this point, "'state law is inoperative,' and the tax consequences [now] are dictated by federal law." *Nat'l Bank of Commerce*, 472 U.S. at 722 (quoting *Bess*, 357 U.S. at 56–57). This conclusion is bolstered by the fact that the courts that have extensively analyzed this issue have all concluded that federal

law controls.  Thus there is no risk of inconsistent treatment of this choice of law issue. *See In re Majestic Star Casino*, 716 F.3d at 751–52; *In re Bakersfield Westar*, 226 B.R. at 233; *In re Trans-Line West*, 203 B.R. at 661.  Federal tax law, which is dependent on certain state law conclusions, dictates whether S corporation status is a property right for sections 544(b) and 548(a)(1) of the Bankruptcy Code.

The Fourth Circuit has recognized that certain interests constitute "property" for federal tax purposes when they embody "essential property rights," which include (1) the right to use; (2) the right to receive income produced by the purported property interest; (3) the right to exclude others; (4) the breadth of the control the taxpayer can exercise over the purported property; (5) whether the purported property right is valuable; and (6) whether the purported right is transferable.  *See Virginia Historic Tax Credit Fund*, 639 F.3d at 141 (citing *Craft*, 535 U.S. at 283; *Drye*, 528 U.S. at 60–61).[19]  A reviewing court must weigh those factors in order to determine whether the interest in S corporation status constitutes "property" for federal tax purposes.  *See id.* at 141.[20]

---

[19] The Fourth Circuit in *Virginia Historic Tax Credit Fund* utilized the analysis from *United States v. Craft* to determine whether the interest at issue classified as "property" for section 707 of the Tax Code.  639 F.3d at 140–41.  While *Virginia Historic Tax Credit Fund* concerned section 707 of the Tax Code, the Court finds the analysis and balancing test applicable to this case.  Courts have repeatedly applied the *Craft* analysis to several different federal statutes.  *See Greene v. Savage* (*In re Greene*), 583 F.3d 614, 620 (9th Cir. 2009) (applying the *Craft* analysis to 11 U.S.C. § 522(p)(1)); *Wallace v. Rogers* (*In re Rogers*), 513 F.3d 212, 223–24 (5th Cir. 2008) (applying the *Craft* analysis to 11 U.S.C. § 522(p)(1)); *In re Conrad*, 544 B.R. 568, 571–73 (Bankr. Md. 2016) (applying the *Craft* analysis to 11 U.S.C. § 522(b)(3)(B)); *U.S. v. Towne*, 406 F. Supp. 2d 928, 935 (N.D. Ill. 2005) (applying the *Craft* analysis to 26 U.S.C. § 6321).

[20] The courts in *In re Trans-Line West*, *In re Frank Funaro, Inc.*, *In re Bakersfield Westar*, and *In re Walterman Implement* found that any interest of the debtor that could be "used, enjoyed, and disposed of" should be considered property under the Bankruptcy Code.  *See In re Bakersfield Westar*, 226 B.R. at 234; *In re Frank Funaro, Inc.*, 263 B.R. at 898; *In re Walterman Implement, Inc.*, 2006 WL 1562401 at *3; *In re Trans-Line West*, 203 B.R. at 661.  The phrase "use, enjoy, and dispose" was borrowed from a property treatise and Black's Law Dictionary.  *See In re Trans-Line West*, 203 B.R. at 661 (citing 63A Am. Jur. 2d *Property* § 1 (1984); Black's Law Dictionary 1216 (6th ed. 1990)).  Under that property right theory, S corporation status was property because a debtor has the right to "use, enjoy, and dispose" of the S corporation status.  *See In re Bakersfield Westar*, 226 B.R. at 234; *In re Frank Funaro, Inc.*, 263 B.R. at 898; *In re Walterman Implement, Inc.*, 2006 WL 1562401 at *3; *In re Trans-Line West*, 203 B.R. at 661.

Applying the "essential property rights" factors identified by the Fourth Circuit to the case at bar, the Court concludes that S corporation status is not a property right under federal tax law. Only one of the factors identified by the Fourth Circuit leans in favor of classifying S corporation status as property. That is the Debtors' ability to use the S corporation tax status to pass their tax liability through to their shareholders. But the "right to use" is the weakest of the "essential property rights." Without the rights of control and disposition, the right to use is devoid of any meaningful property interest – such as the right to use a tool borrowed from a neighbor. *See In re TMT Procurement Corp. v. Vantage Drilling Co.*, 764 F.3d 512, 523–26 (5th Cir. 2014) (rejecting the debtor's argument that shares of stock it had been allowed to use to establish adequate collateral were "property of the estate," when the debtor had neither the right to control or retain those shares). While the Debtors may have had the right to use the S corporation status, they lacked the ability to control the use of their tax classification. The right to use the classification existed only until termination.[21]

The second factor, that the tax classification is valuable, does not lean in favor of finding that S corporation status qualifies as a property right. The Liquidating Trustee hopes to generate value through avoidance of the "transferred" S corporation revocation in 2015, thus retroactively reclassifying HDL as an S corporation during that taxable year. The Liquidating Trustee wants to amend the Debtors' 2015 income tax return by refiling it as an S corporation in place of the prior filing as a C corporation. The amended 2015 income tax return will report losses, which

---

[21] The Liquidating Trustee asserts that a "mere possessory interest at the time of filing" a bankruptcy case suffices to give "an interest in property protected by section 362(a)(3)" of the Bankruptcy Code. *See Cuffee v. Atl. Bus. & Cmty. Corp.* (*In re Atl. Bus. & Cmty. Corp.*), 901 F2d 325, 328 (3d Cir. 1990). The case upon which the Liquidating Trustee relies involved a violation of the automatic stay – not an avoidance recovery action. The protection afforded by the automatic stay is quite different from that at issue in the case at bar. By its terms, the automatic stay prohibits "any act to obtain . . . property from the estate." *See* 11 U.S.C. § 362(a)(3). Section 362(a)(3) of the Bankruptcy Code serves to protect the debtor postpetition against the seizure of any property in its possession without regard to the interest of the debtor in the property.

will pass through to the Shareholder Defendants.    The Trustee expects the individual shareholders to then file their own personal amended income tax returns that will include the Debtors' losses.    The Liquidating Trustee hopes to apply those losses against any income the shareholders claimed in 2015 and then to carry the unused losses back for the 2 prior tax years. Those losses will entitle the shareholders to tax refunds from applicable taxing authorities to the extent of the shareholders' basis in the Debtors' stock.    The Liquidating Trustee intends to demand those refunds from the shareholders for the benefit of the Liquidating Trust.    With these actions, the Liquidating Trustee attempts to create value by collecting money from the United States and the State Taxing Authorities in order to maximize returns to creditors, the largest of whom is, coincidentally, the United States.[22]    This chain of events (if successful) may create value for the estate.    *See, e.g.*, *In re Bakersfield Westar*, 226 B.R. at 234 ("The ability to not pay taxes has a value to the debtor-corporation in this case").[23]

The fact that something confers value to the estate does not necessarily create a property right in it.    A beneficiary's interest in a life insurance policy may be valuable, but that alone does not make it property of the beneficiary.    *See, e.g.*, *Wornick v. Gaffney*, 544 F.3d 486, 490 (2d Cir. 2008) (holding that a beneficiary of a life insurance policy "has no legal or equitable interest in the policy that could be made part of the property of the beneficiary's bankruptcy estate.").[24] Similarly, a corporation cannot claim a legal or equitable property interest to a valuable benefit

---

[22] The DOJ has a proof of claim in the amount of $94,144,852.52 plus interest.

[23] The State Taxing Authorities suggest that it is debatable whether the Liquidating Trustee could succeed in forcing the shareholders to file amended income tax returns or to pay over any refunds that may be generated.    Moreover, the Tax Code prohibits the Trustee from carrying-back or carrying-forward losses between C corporation taxable years and S corporation taxable years.    *See* 26 U.S.C. § 1371(b).

[24] Contingent rights can be property of a bankruptcy estate but only to the extent that the contingency allows.    *See, e.g.*, *Allen v. Levey* (*In re Allen*), 226 B.R. 857, 867 (Bankr. N.D. Ill. 1998).

that another party has the power to legally revoke at any time.  *See, e.g.*, *In re TMT Procurement Corp.*, 764 F.3d at 523–24.

Congress intended the election of S corporation status to limit the influence of tax considerations on choice of entity used to own a business.[25]  The election removes a layer of taxation on distributed earnings by permitting the corporation to pass its income through to the corporation's shareholders.  The logical consequence of the shareholders' decision to elect S corporation status is their decision to enter into a shareholders' agreement requiring the corporation to make distributions from its earnings to cover the amount of tax the shareholders incur on the income that is passed through to them.  This arrangement is generally neutral as to the amount of tax a corporation would otherwise pay.  The benefit is to the shareholders – it allows them to avoid double taxation.  To the extent there is value inherent in the S election, it is value Congress intended for the corporation's shareholders and not for the corporation.

The Liquidating Trustee would have the "happenstance of bankruptcy" change this.[26]  As the HDL Shareholders' Agreement is a contract, it can be rejected under section 365 of the Bankruptcy Code.[27]  The entity producing the income becomes divorced thereby from the entity with the obligation to pay tax on that income.  Citing *In re Bakersfield Westar*, 226 B.R. 227, the

---

[25] *See* David R. Sicular, *Subchapter S at 55 – Has Time Passed this Passthrough By? Maybe Not*, 68 TAX LAW. 185, 193–94 (2015) (citing S. Rep. No. 85-1983, at 87 (1958); JAMES S. EUSTICE & JOEL D. KUNTZ, EUSTICE & KUNTZ: FEDERAL INCOME TAXATION OF S CORPORATIONS ¶ 1.02[3] (4th ed. 2001)) (discussing the stated purpose for enacting Subchapter S).

[26] *See Lewis*, 364 U.S. at 609 (recognizing a policy against "creating a windfall merely by reason of the happenstance of bankruptcy.").

[27] The Shareholders' Agreement was rejected when the Debtors' Plan was confirmed.  *See In re Health Diagnostic Laboratory, Inc.*, 557 B.R. 885, 896 (Bankr. E.D. Va. 2016).  The rejection constitutes a breach of the Shareholders' Agreement "immediately before the date of the filing of the petition" giving rise to prepetition claims by the shareholders against the Debtors for breach of contract.  *See* 11 U.S.C. §§ 365(g)(1), 502(g)(1); *Riggs Nat'l Bank of Washington, D.C. v. First Am. Bank of Virginia (In re Andrews)*, 80 F.3d 906, 912 (4th Cir. 1996) (identifying that the purpose of section 365(g) of the Bankruptcy Code "is to treat rejection claims as prepetition claims").

Liquidating Trustee contends that there is postpetition value to this ability of the Debtors to avoid directly paying taxes on their own income. The Trustee argues that it is this value that makes the Debtors' S corporation status an interest in property. But this rationale runs afoul of the prohibition against creating in bankruptcy "new property rights or value where there previously were none." *In re Messina,* 687 F.3d 74, 82 (3d Cir. 2012); *cf. Butner v. United States,* 440 U.S. at 56 (noting that the holder of a property interest "is afforded in federal bankruptcy court the same protection he would have under state law had no bankruptcy ensued").

The remaining factors also lean in favor of finding that S corporation status does not constitute a property right under federal tax law. Most importantly, a corporation has very little control over S corporation status. The right to exercise dominion and control over an interest is an essential characteristic defining property. *See Craft,* 535 U.S. at 283–84 ("In determining whether a federal taxpayer's state-law rights constitute 'property' or 'rights to property,' the important consideration is the breadth of the control the taxpayer could exercise over the property." (quoting *Drye,* 528 U.S. at 61)). Numerous other courts have pointed to this factor as being of critical importance. *See Stettner v. Smith* (*In re IFS Fin. Corp.*), 669 F.3d 255, 263 (5th Cir. 2012) (noting that, under Texas law, "control over funds in an account is the predominant factor in determining an account's ownership"); *Riley v. Nat'l Lumber Co.* (*In re Reale*), 584 F.3d 27, 31 (1st Cir. 2009) ("When determining whether certain funds are considered 'an interest of the debtor in property,' the ability of the debtor to exercise control over the property can be determinative"); *Sigmon v. Royal Cake Co.* (*In re Cybermech, Inc.*), 13 F.3d 818, 820–21 (4th Cir. 1994) (once an entity deposits a check into its account, its "ability to exercise complete 'dominion and control over the funds' is sufficient to 'demonstrate an interest in property' under the preferential transfer provision." (quoting *In re Smith*, 966 F.2d 1527, 1531 (7th Cir. 1992)).

Shareholders have the overwhelming ability to control the tax status of their corporation. Election of S corporation status may be achieved by one method—unanimous shareholder consent. The federal tax statute governing the election of S corporation status states that "[a]n election under this subsection shall be valid only if *all persons who are shareholders* in such corporation on the day on which such election is made consent to such election." 26 U.S.C. § 1362(a)(2) (emphasis added). The plain language of the statute makes abundantly clear that the shareholders elect S corporation status—not the corporate entity—and that any interest in electing S corporation status belongs to the shareholders.

Contrary to the conclusion drawn by the court in *In re Trans-Line West*, an S corporation does not have a vested interest in its tax status after the election has been made.[28] Termination of S corporation status may be achieved in one of three ways—by the consent of majority of shareholders and the corporate entity, when the corporation ceases to be a considered a small business corporation, or where passive investment income exceeds 25% of gross receipts for 3 consecutive taxable years and the corporation has accumulated earnings and profits. *See id.* § 1362(d)(1)–(3). All three are contingent on shareholder or market action. The corporation has no unilateral control over any of the events that could trigger S corporation status revocation. As the Third Circuit found in *In re Majestic Star Casino*, the "tax status of the entity is entirely contingent on the will of the shareholders." 716 F.3d at 756.

The Liquidating Trustee asserts that the statute and the regulations demonstrate that the S corporation itself controls whether it can revoke its S corporation election. *See* 26 U.S.C.

---

[28] In *In re Trans-Line West*, that court found that "once a *corporation* elects to be treated as an S corporation, I.R.C. § 1362(c) guarantees and protects the *corporation's* right to use and enjoy that status until it is terminated under I.R.C. § 1362(d). Moreover, § 1362(d)(1)(A) provides that '[a]n election under subsection (a) may be terminated by revocation.'" 203 B.R. at 662 (emphasis added). That court held that, because 26 U.S.C. § 1362(d)(1)(A) protected an S corporation's right to dispose of its tax status, the debtor possessed a property interest in it. *See id.*

§ 1362(d)(1); 26 C.F.R. § 1.1362-6(a)(3).  The Liquidating Trustee argues that the corporation

has the ability to guarantee its own tax status because the corporation must file the necessary

paperwork with the IRS.  However, those regulations pertain to the procedural method by which

the corporation implements the decision of its shareholders.  The mere filing of the tax form does

not confer control over the S corporation status.  It is unrealistic to suggest that a corporation

could ever revolt against its shareholders by refusing to file the revocation form.  *Cf. Sery v. Fed.*

*Bus. Ctrs., Inc.*, 616 F. Supp. 2d 496, 505 (D.N.J. 2008) ("finding that a shareholder is bound

forever by the decision to elect Subchapter S status is a bridge too far and not something that can

reasonably be read into the Subchapter S IRS election forms.").

The Liquidating Trustee doubled down on this position at the Hearing.  The Liquidating

Trustee argued that, as HDL was a party to it, the Shareholders' Agreement was an "interest of

the debtor in property" for the purposes of 11 U.S.C. §§ 544(b), 548.  The Liquidating Trustee

claims that the parties to the Shareholders' Agreement intended for the S corporation election to

run in perpetuity and forever bind the shareholders.[29]  The Liquidating Trustee alleges that the

shareholders violated the Shareholders' Agreement when they revoked the S corporation election

because they breached their covenant of good faith and fair dealing under Virginia law.  *See*

*Stoney Glen, LLC v. S. Bank & Trust Co.*, 944 F. Supp. 2d 460, 465–66 (E.D. Va. 2013).  The

---

[29] Section 12(a) of the Shareholders' Agreement states

> Eligible Shareholders.  The parties acknowledge that it is their intent to maintain the S election of
> the Company and to prevent any inadvertent and unintended termination of the election until
> voluntarily revoked by the Shareholders.  Therefore, notwithstanding anything in this Agreement
> to the contrary, no Shareholder shall transfer, and the Company shall not issue, any Shares to any
> person or entity if such transfer or issuance would in any manner result in the termination of the
> Company's S election.   Any transfer or issuance that in any manner could result in such
> termination shall be absolutely null and void ab initio and without legal effect.

Exhibits at Ex. C pages 8–9, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919, APN 17-04300 (Bankr. E.D.
Va. Nov. 27, 2017), ECF No. 51 (emphasis in original).

Liquidating Trustee seeks to avoid the revocation of S corporation status *vis à vis* HDL's rights as a party to the Shareholders' Agreement.

This argument fails for a myriad of reasons. First, the Shareholders' Agreement gave the shareholders, and not HDL, the right to revoke the S corporation election.[30] Second, the shareholders maintained the right to amend the Shareholders' Agreement at any time.[31] Third, even if the Liquidating Trustee were correct in his interpretation of the Shareholders' Agreement, the Liquidating Trustee would have no right to specifically enforce a contract that the Debtors rejected.[32] Fourth, the IRS and State Taxing Authorities are not parties to the Shareholders' Agreement. They would not be bound by the avoidance of any shareholder decision thereunder in any event. *See* 26 U.S.C. § 1362(d). The Liquidating Trustee cannot hold the shareholders "tax hostage" by avoiding their decision to revoke the S corporation election. *See Sery*, 616 F. Supp. 2d at 505 n.3 ("[S]hareholders in closely held S corporations would effectively be held hostage if the [c]ourt were to find that Subchapter S election contractually bound a shareholder to preserve the tax favored status.").

---

[30] Section 12(d) of the Shareholders' Agreement states

> Revocation of S Election.  The Shareholders agree that a consent to revocation of the Company's S election under Section 1362(d)(1) of the [Tax] Code shall not be filed with the Internal Revenue Service except upon the two thirds (2/3) vote of the issued and outstanding voting Shares of the Company.

Exhibits at Ex. C page 9, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919, APN 17-04300 (Bankr. E.D. Va. Nov. 27, 2017), ECF No. 51 (emphasis in original).

[31] Section 19 of the Shareholders' Agreement states

> Modification or Amendment.  This Agreement shall be subject to modification or amendment only by an instrument in writing signed by all of the Shareholders that own voting common stock.

Exhibits at Ex. C page 11, *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919, APN 17-04300 (Bankr. E.D. Va. Nov. 27, 2017), ECF No. 51 (emphasis in original).

[32] *supra note* 27.

A corporation lacks control of its tax status in any event because a slight change in corporate form could shatter a corporation's S corporation status without the corporation filing a revocation form.  For example, the sale by a shareholder of one share of stock to a partnership or to a nonresident alien would automatically dissolve a corporation's S corporation status.  *See* 26 U.S.C. § 1362(d)(2) (stating that S corporation status is terminated if "such corporation ceases to be a small business corporation").  As the S corporation election could be terminated voluntarily by the actions of any one shareholder, it is impossible to state that a corporation has complete control over its S corporation status.  Unilateral shareholder action could extinguish S corporation tax status without the corporation taking any action.

Finally, there is no right to exclude other companies from utilizing S corporation status or from preventing them from enjoying the benefits of that tax classification.  Any corporation that possesses the necessary corporate attributes may, through unanimous shareholder consent, elect to be an S corporation.  *See* 26 U.S.C. §§ 1361(b), 1362(a)(2).  S corporation status is not reflected as an asset on a corporation's balance sheet.  S corporation status is not something of value that can be transferred by the corporation to an acquiring company.  S corporation status does not produce income.  Rather, S corporation status is a statutory privilege that qualifying shareholders can elect in order to determine how income otherwise generated is to be taxed.

Contrary to the Liquidating Trustee's assertions, a corporation's tax status differs markedly from a corporation's net operating losses ("NOL").[33]  NOLs have several "essential

---

[33] An NOL is created when a taxpayer's deductible business expenses exceed its net income for a given tax year. *See* 26 U.S.C. § 172.  When a taxpayer sustains an NOL, the taxpayer may carry back the loss two years and use the NOL as a deduction in those tax years.  *See id.* § 172(b)(1)(A)(i).  If there is still a loss at the end of the two-year carryback period, then the taxpayer may carry the NOL forward and use it as a deduction from the taxpayer's income over the next 20 years.  *See id.* § 172(b)(1)(A)(ii).  Congress has recognized that carryback NOLs are property of a debtor's bankruptcy estate.  *See* H.R. Rep. No. 95-595, at 367 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6323.  A number of courts have held that carryforward NOLs are also "property" of the estate.

property rights" that are absent in S corporation status. *See Virginia Historic Tax Credit Fund*, 639 F.3d at 141 (citing *Craft*, 535 U.S. at 283; *Drye*, 528 U.S. at 60–61). First, a taxpayer corporation has the right to exclude others from an NOL, while a corporation cannot exclude others from using S corporation status. Second, the taxpayer has much more control over an NOL than over S corporation status. NOLs cannot be revoked or terminated by another party, unlike S corporation status, which can be terminated by shareholder action that causes the corporation to cease to qualify as a small business corporation. *See* 26 U.S.C. § 1362(d)(2). Third, an NOL is transferable to other entities, while S corporation status cannot be transferred. *See, e.g.*, *In re A.H. Robins Co.*, 251 B.R. 312, 315, 320–21 (upholding the validity of a confirmation order that transferred NOLs from the debtor to a successor corporation); *see also In re Majestic Star Casino*, 716 F.3d at 756 ("A corporation that does not expect to generate sufficient future earnings to use its NOLs may be purchased by another more profitable corporation which may then use the NOLs to shelter its own income, a transaction expressly contemplated by the I.R.C." (citing 26 U.S.C. § 382)).

Holding that S corporation status is not "property" for the purposes of 11 U.S.C. §§ 544(b), 548 is consistent with the complementary provisions of the Bankruptcy Code and Tax Code. Tax status is one part of the legal framework governing the manner in which tax is paid. Some tax statuses, such as the S corporation status, require that an election be made.[34] These elections come with beneficial and burdensome consequences. *See Nat'l Bank of Commerce*, 472 U.S. at 722 (The Tax Code "attaches consequences, federally defined, to rights created under

---

*See, e.g.*, *Gibson v. United States* (*In re Russell*), 927 F.2d 413, 417–18 (8th Cir. 1991); *In re Prudential Lines*, 107 B.R. at 836–42.

[34] *See, e.g.*, 26 U.S.C § 6013 (permitting married individuals to elect to file jointly or separately); 26 U.S.C § 1501 (permitting affiliated groups of corporations to elect to file only one tax return).

state law.").  The Bankruptcy Code explicitly defers to these tax consequences.  *See* 11 U.S.C.

§ 346(k); *see also Hall v. United States*, 566 U.S. 506, 514–15 (2012) (recognizing that section

346 of the Bankruptcy Code applies to federal taxes).

Neither the Bankruptcy Code nor Tax Code allow for a trustee to choose the tax status of

the entity.  The Bankruptcy Code requires that a trustee furnish returns for any year where a

return was not filed according to laws required by the governmental unit with which the tax

return was to be filed.  *See* 11 U.S.C. §§ 346(k), 1106(a)(6).[35]  The Tax Code requires that a

trustee "make the return of income for such corporation in the same manner and form as

corporations are required to make such returns."  26 U.S.C. § 6012(b)(3).  In this case, HDL was

a C corporation for tax purposes in 2015.  HDL was required to file as such.  The Liquidating

Trustee cannot use the fraudulent transfer provisions of the Bankruptcy Code to maneuver

around the strict requirements of the Tax Code.

### Conclusion

After weighing all the factors, this Court will adopt the holding of the Court of Appeals

for the Third Circuit that S corporation status is not property under federal tax law.  *See In re

Majestic Star Casino*, *LLC*, 716 F.3d 736 (3d Cir. 2013) (concluding that S corporation status

was not "property" under the Bankruptcy Code and sharply disagreeing with *In re Trans-Line

West* and the cases that followed).  Although a corporation and its shareholders can elect to use S

corporation status in order to avoid double taxation, that factor alone is not enough to outweigh

all the remaining characteristics essential to qualify tax status as a property right.  Accordingly,

---

[35] Section 346(k)(1) of the Bankruptcy Code provides that the "time and manner of filing tax returns and the items of income, gain, loss, deduction, and credit of any taxpayer shall be determined under applicable nonbankruptcy law."  Congress created an exception to this section for 11 U.S.C. § 505.  The statute provides no similar exception for 11 U.S.C. §§ 544(b), 548.  *See* 11 U.S.C. § 346(k).  Accordingly, this Court does not read the statute to permit the avoidance provisions for fraudulent transfers under 11 U.S.C. §§ 544(b), 548 to alter the "time and manner of filing tax returns" for the Debtors.

this Court holds that S corporation status is not "property" under federal tax law, and thus cannot

be considered "property" for the purposes of sections 544(b) and 548(a)(1) of the Bankruptcy

Code.

        A separate order shall issue.

ENTERED: Dec 6 2017
_____

                                    _____/s/ Kevin R. Huennekens_____
                                    UNITED STATES BANKRUPTCY JUDGE

                                    Entered on Docket:  Dec 6 2017